UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JAMES E. PASIONEK,

               Plaintiff/Counter-Defendant,                  Case No. 1:21-cv-12651

v.                                             Honorable Thomas L. Ludington
                                               United States District Judge

ROBERT A. PASIONEK,

               Defendant/Counter-Plaintiff.

_____/

**OPINION AND ORDER DENYING DEFENDANT/COUNTER-PLAINTIFF'S MOTION
FOR RECONSIDERATION**

Thirty-eight years ago, brothers James and Robert Pasionek formed Pasionek Partnership to purchase hunting property in Alcona County, Michigan. The Partnership Agreement imposed duties on both brothers to maintain capital accounts and a Partnership accounting. But none of these accounts were kept. The reason for the Parties' apparent mutual breach? "Laziness." ECF No. 77 at PageID.2676.

By 2021, both Parties claimed to be the most significant capital contributors. Yet neither had financial statements or all the source documents to corroborate their claim. So they marched to this Court for a solution. When discovery closed, facing a shaky accounting record, this Court appointed an expert accountant, Eric Larson. After Mr. Larson sifted through heaps of the Parties' decades-old documents, a few legal and factual questions remained before Mr. Larson could complete his accounting of the Partnership. This Court issued an order resolving those questions. In response, Robert filed a motion for reconsideration. As explained below, his motion will be denied.

## I.

## A.

In September 1986, brothers James and Robert Pasionek formed a Partnership to purchase

hunting property in Alcona County. ECF No. 1-1 at PageID.7. Robert, a licensed attorney, drafted

the Partnership Agreement. *See* ECF No. 77 at PageID.2637. Michigan law governs this

Agreement. ECF No. 28 at PageID.920. Four provisions of the Partnership Agreement are

particularly relevant to the remaining disputes:

(1) Article 3.6 requires that each brother maintain "[a]n individual capital account . . . on a constant basis." *Id.* at PageID.912. According to the provision, each brother's capital account shall consist "of his original contribution" and may be increased by "his additional capital contributions" and "his Partnership profits" and decreased by "distributions to him in reduction of Partnership capital and "his share of Partnership losses." *Id.*

(2) Article 5.2 prohibits the payment of "a salary or other compensation" to a Partner "for performance of those services required of them hereunder, except under and pursuant to a written agreement with the Partnership, contented to by all of the Partners." *Id.* at PageID.915.

(3) Article 5.3 provides that each Partner "shall be entitled to reimbursement for the actual cost of expenses incurred by them which are necessary to conduct the Partnership's business and reasonable with respect to the amount and the purpose of the undertakings contemplated by this Agreement." *Id.*

(4) Article 12.8 provides that the "Partners shall execute and deliver such further instruments and do such further acts and things as may be required to carry out the intent and purposes of this Agreement." *Id.* at PageID.920.

## B.

Over the next 35 years, the brothers' relationship deteriorated. In 2021, James Pasionek

sued his brother, Robert Pasionek, after Robert allegedly attempted to sell the Partnership Property

without James's permission. ECF No. 1-1.

Indeed, James filed a seven-count breach-of-fiduciary-duty action in Alcona County

Circuit Court, which Robert removed to this Court in November 2021. *See id.* Robert then filed

four counterclaims alleging, among other things, that James breached the Partnership Agreement by not making required contributions to the Partnership. *See* ECF No. 17.

Much of the brothers' dispute focuses on the value of their respective Partnership Capital Accounts, but "[t]he answer to this factual [question] is buried under [three decades] of incomplete or disputed accounting." ECF No. 67 at PageID.2589. Indeed, it appears both brothers breached the Partnership Agreement by not maintaining this accounting.

As a result, on October 6, 2023, this Court appointed an expert certified public accountant, Eric Larson, to help resolve this disputed partnership accounting. *Id.* at PageID.2591–92; *see also* FED. R. CIV. P. 706 (authorizing the Court to appoint an expert witness that the parties agree on and who "consents to act" as such an expert). At a March 26, 2024, Status Conference, "the Parties, Larson, and this Court agreed on six [unresolved] legal or factual issues that will directly impact the accounting." ECF No. 71 at PageID.2597. The six issues centered on whether the following items counted as capital contributions:

(1) Legal services Robert allegedly provided;
(2) James's property maintenance services;
(3) James's hunting blind repairs;
(4) Robert's log cabin that he placed on the property;
(5) Robert's installation of a gravel road on the property; and
(6) The Parties' purchase of a small parcel to add to the property.

*See* ECF Nos. 77 at PageID.2633–34; 78 at PageID.2719–22. At a later Status Conference, the Parties, Larson, and this Court agreed to a virtual evidentiary hearing to resolve these issues without expending exorbitant resources on travel. *See* ECF No. 76 at PageID.2629.

So, confronting the precarious record, this Court held a virtual hearing to resolve these issues on July 10, 2024. ECF No. 77. The undersigned conducted the hearing in the courtroom in Bay City, Michigan, with a stenographer present. James and his Counsel were in northeast

Michigan, Robert in Phoenix, Arizona, and Robert's Counsel in Grand Rapids, Michigan. Both brothers were examined by their counsel, opposing counsel, and Mr. Larson. *See generally id.*

After considering the Parties' testimony and all exhibits, this Court issued an order resolving Mr. Larson's questions. ECF No. 78 [hereinafter "the Order"]. First, the Order held that most of Robert's alleged legal services were not capital contributions. *Id.* at PageID.2719–20. Specifically, the Order interpreted Article 5.2 of the Partnership Agreement to require a written agreement including both partners' consent for Robert to be compensated for his alleged legal services. *Id.* at PageID.2719. But the Order credited Robert for his legal work on drafting the Partnership Agreement, totaling $6,575.00, because it predated Article 5.2. *Id.* at PageID.2719–20. Second, the Order concluded that (1) James's property maintenance costs, (2) James's hunting blind repairs, and (3) Robert's log cabin, were personal expenses, not capital contributions to the Partnership. *Id.* at PageID.2720. Third, the Order concluded that Robert's gravel road installation was a capital contribution since it was required under an Alcona County Circuit Court order. *Id.* at PageID.2720–21. And fourth, the Order determined that James and Robert should be equally credited for purchasing a small parcel to add to the property. *Id.* at PageID.2721–22.

Based on the Order, Mr. Larson produced a capital accounting for the Pasionek Partnership. ECF No. 78-1. In the end, it concluded that James contributed $80,788 and Robert contributed $42,945 to the Partnership. *Id.* at PageID.2731. Thus, James contributed 65.3% of the Partnership's Capital, while Robert contributed 34.7%. *Id.*

On September 3, 2024, Robert moved for reconsideration of the Order. ECF No. 79.

## II.

Reconsideration is permitted under three circumstances: (1) a mistake that changes the outcome of the prior decision, (2) an intervening change in controlling law that warrants a different outcome, or (3) new facts that warrant a different outcome. E.D. Mich. LR 7.1(h)(2).

Because Robert has not presented any new facts or controlling law in his Motion, ECF No. 79, the only basis for reconsideration is a mistake that changed the outcome of the order. Thus, his Motion will be considered under Local Rule 7.1(h)(2)(A), which requires Robert to demonstrate that (1) the court made a mistake, (2) correcting the mistake changes the outcome of the prior decision, and (3) the mistake was based on the record and law before the court at the time of its prior decision. *Hillman Power Co. v. On-Site Equip. Maint., Inc.*, No. 1:19-CV-11009, 2022 WL 193598, at *3 (E.D. Mich. Jan. 21, 2022) (citing E.D. MICH. LR 7.1(h)(2)(A)).

## III.

In his Motion for Reconsideration, Robert challenges (1) the resolution of his alleged legal services, (2) the classification of his log cabin as a personal expense, and (3) Mr. Larson's expert report relating to some costs credited to James. *See id.* at PageID.2741–49. Each ground for reconsideration will be addressed in turn.

## A.

Beginning with the Order's resolution of his alleged legal services, Robert raises two arguments. First, he contends that it misconstrued Article 5.2 of the Partnership Agreement. *See* ECF No. 79 at PageID.2741–46. To that end, he argues that when properly interpreted, Article 5.2 did not require a written agreement featuring both Partners' consent for Robert to be compensated for legal services he allegedly provided after the Partnership Agreement's execution. *See id.*

Second, he asserts that the Order miscalculated his pre-Partnership Agreement legal services. *Id.*

at PageID.2746–47. Both arguments lack merit.

**1.**

**a.**

Up front, this Court does not share Robert's view that Article 5.2 of the Partnership

Agreement has been misinterpreted, so Robert is not entitled to capital contribution credit for his

alleged legal services following the Partnership Agreement's execution. Under Michigan law,

when interpreting a contract, courts start with the contract's text and construe it as a whole. *Smith*

*v. Smith*, 823 N.W.2d 114, 116 (Mich. Ct. App. 2011) (citing *Duval v. Aetna Cas. & Surety Co.*, 8

N.W.2d 112 (Mich. 1943)). And a court must interpret this text "according to its plain and ordinary

meaning." *Ajax Paving Indus., Inc. v. Vanopdenbosch Const. Co.*, 797 N.W.2d 704, 707 (Mich.

Ct. App. 2010). When construed as a whole, if the "language of a contract is clear and

unambiguous . . . [the] contract must be enforced according to its terms." *Id.* (cleaned up). But if

the contract is ambiguous courts "can look to such extrinsic evidence as the parties' conduct, the

statements of its representatives, and past practice" to determine what the parties intended the

contract to mean. *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453–54 (Mich. 2003).

Here, at first glance, Article 5.2 seems straightforward—a partner may receive

compensation for services he performs without a written agreement unless the partner is expressly

required to provide the performed services under the Partnership Agreement:[1]

> 5.2 <u>Compensation.</u> The Partners shall not be entitled to a salary or other
> compensation for performance of those *services required of them hereunder*, except
> under and pursuant to a written agreement with the Partnership, consented to by all
> of the Partners. In the event that any such compensation shall be paid pursuant to

---

[1] Even so, the logic of this provision seems strange. Indeed, one would expect partners to require
a written agreement detailing when the partnership is bound to compensate a partner for work *not*
contemplated in a partnership agreement.

this Section 5.2 or pursuant to such an agreement, it shall be treated as an expense
in determining profits and losses of the Partnership.

ECF No. 28 at PageID.915 (emphasis added). And, under that reading, because the Partnership

Agreement's terms do not explicitly require Robert to perform legal services, Robert never needed

a written agreement for this Court to credit his alleged legal services as capital contributions. But

at second glance, ambiguity ensues.

The contract is ambiguous because the Partnership Agreement does not expressly

enumerate a single *service* that the Partners are required to perform. *See generally* ECF No. 28.

Indeed, the ordinary meaning of "service" as used in the contract is the "[p]erformance of labor

for the benefit of another." WEBSTER'S NEW INTERNATIONAL DICTIONARY 2288 (2d ed. 1934);

*accord* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2075 (2002); *Doeren Mayhew &*

*Co., P.C. v. CPA Mut. Ins. Co. of Am. Risk Retention Grp.*, 633 F. Supp. 2d 434, 441 (E.D. Mich.

2007) (defining "services" as work "done directly for the benefit of others"). And parsing the

Partnership Agreement's provisions, not one unambiguously describes a "service" within its

ordinary meaning. *See generally* ECF No. 28; *see also* ECF No. 54 at PageID.2023 (observing that

the Partnership Agreement contains no provision specifying particular services that the Parties

were required to provide). Rather, the contract largely describes general financial duties—not labor

or work for the benefit of another. *See, e.g.*, ECF No. 28 at PageID.911–12, 916. All said, this lack

of expressly enumerated services yields ambiguity because, without enumeration, it is unknown

what particular "services" are "required of [the partners]" under the Partnership Agreement.[2]

---

[2] And there must, of course, be some particular services required under the Partnership
Agreement—even if not expressly enumerated—otherwise Article 5.2 would be surplusage.
Indeed, if there are no required services, a provision requiring a written agreement to be
compensated for required services, as Article 5.2 does, has no legal force. So Robert's
interpretation is suspect because, under Michigan law, courts must construe contracts to "give
effect to every word or phrase as far as practicable." *Klapp v. United Ins. Grp. Agency, Inc.*, 663
N.W.2d 447, 453 (Mich. 2003) (cleaned up). This Court's interpretation below gives effect to

The closest the Partnership Agreement gets to describing a service is Article 12.8, entitled "Further Actions." *See* ECF No. 28 at PageID.920. Article 12.8 provides that "[t]he Partners shall execute and deliver such further instruments *and do such further acts and things as may be required* to carry out the intent and purposes of this Agreement." *Id.* (emphasis added). But it does not enumerate specific acts or services falling within that provision, so the ambiguity remains: one must still determine whether the Parties intended any legal services Robert allegedly provided to be needed to carry out the Partnership. *See City of Grosse Pointe Park v. Michigan Mun. Liab. & Prop. Pool*, 702 N.W.2d 106, 113 (Mich. 2005) (describing this type of ambiguity as a latent ambiguity that does not necessarily "appear in the language of the document, but instead arises from a collateral matter when the document's terms are applied . . . ."); *see also Shay v. Aldrich*, 790 N.W.2d 629, 641 (Mich. 2010) ("To verify the existence of a latent ambiguity, a court must examine the extrinsic evidence presented and determine if in fact that evidence supports an argument that the contract language at issue, under the circumstances of its formation, is susceptible to more than one interpretation.").

**b.**

Given this ambiguity, the lingering question is as follows: Did the Parties intend for any legal services that Robert allegedly provided after the Parties executed the Partnership Agreement to be needed to carry out the Partnership, such that Article 5.2 required a written agreement

---

every word because if Article 12.8—even if ambiguous—imposes a services requirement, then there are "services required hereunder," and Article 5.2 has legal force. *Cf. Nichols v. Stat Radiology Med. Corp.*, No. 21-1560, 2022 WL 874312, at *4–5 (6th Cir. Mar. 24, 2022) (citing *Ajax Paving Industries v. Vanopdenbosch Construction Co.*, 797 N.W.2d 704 (Mich. Ct. App. 2010)) (avoiding an interpretation that read provision containing "hereunder" out of the contract and discussing how interpretive concessions, like Robert's stated below, can allow a court to assume conduct at issue "fell within the scope of the contract" to give "hereunder" effect).

featuring both Partners' consent for Robert to receive compensation? The record suggests that they did.

For starters, extrinsic evidence indicates that Robert's alleged services were rendered as a partner with legal experience carrying out the needs of the Partnership, not as an independent attorney representing the Partnership. First, Robert's own statements suggest that any services he furnished were in support of the Partnership's business. *See* ECF No. 34-3 at PageID.1241 ("We all understand and agree that this litigation is required."); *see also* ECF No. 31-2 at PageID.969 ("The Partnership has been involved in several disputes . . . as well as additional transactions that required legal work."). Further, James invariably maintained—and the record supports—that any legal-related services Robert provided were expected of him as "co-owner" and that the Partnership hired outside counsel for actual representation.[3] *See* ECF Nos. 34 at PageID.1081–84; 54 at PageID.2034, 2174, 2177; 81 at PageID.2770–71. And Robert does not dispute that the Partnership hired outside counsel. In fact, Robert's testimony, in many ways, supports James's position. *See, e.g.*, ECF No. 77 at PageID.2681–82 ("[T]he strategy . . . which was discussed that we'd hire local counsel, like I had done for years as general counsel for a number of companies, and then I would oversee the work, almost like a ghosting it."). So because the record indicates Robert's purported services were rendered as a partner carrying out the Partnership, they fall within Article 12.8's scope—meaning they are required under the Partnership Agreement—and Article 5.2 applies to them.

---

[3] Not to mention, as the Order recognized, "Robert's name is not listed as *counsel* for the Pasionek Partnership in any of the litigation documents," *i.e.*, pleadings filed by attorneys representing the Pasionek Partnership, "that this Court has seen." ECF No. 78 at PageID.2719 (emphasis added). And the only documents Robert points to are bills that he produced and correspondence with law firms—not litigation documents—and a verified complaint in which he was the complainant as a "co-partner," ECF No. 31-14 at PageID.1024, not counsel. *See* ECF No. 79 at PageID.2743–46.

Further reinforcing this understanding is that the Parties thought Robert needed to comply

with Article 5.2's written agreement requirement before receiving compensation for his services.

First, the record contains a letter that Robert created and signed regarding his alleged services, in

which he states that he created it attempting to comply "with Section 5.2 of Article V of the

Pasionek Partnership Agreement."[4] ECF No. 34-3 at PageID.1240. Second, Robert testified in a

deposition that he needed a written agreement under Article 5.2 to be compensated for his alleged

legal-related services:

> Q: Okay. And you do understand that under the partnership agreement that you're
> required to have a written agreement between the parties if you are to get any salary
> or compensation for your work, correct?
>
> A: That's why these letters were forwarded, yes.[5]

*Id.* at PageID.1130; *see also id.* at PageID.1117–35 (discussing Robert's alleged legal services and

the lack of an Article 5.2 agreement for them). Third, shortly before this litigation, Robert authored

a "Day of Reckoning" memorandum, in which he predicates his ability to recover compensation

for his claimed services on a supposed agreement with the Partnership—not the interpretation he

now advances. *See* ECF No. 34-3 at PageID.1252. And fourth, James's testimony suggests that he

---

[4] To be clear, this Court is not opining on the validity of this letter or any letter that Robert created, which are subject to much dispute. Indeed, James has asserted that Robert fraudulently created the letters, *see, e.g.,* ECF No. 34 at PageID.1084 (discussing the letters and stating that Robert "has committed fraud regarding his legal billings"), and submitted an expert report suggesting that the font used did not exist until after the date on these letters, *see* ECF No. 34-5 at PageID.1305–06 (concluding that "neither [letter] was created on its purported date"). But even if the letters were fraudulently produced, why would Robert do that unless the Parties intended for it to be needed for compensation under the Partnership Agreement that Robert drafted?

[5] Notably, Robert's understanding and interpretation of the Partnership Agreement was that he needed a written agreement under Article 5.2 to be compensated for any services related to legal issues that he allegedly provided until he obtained new counsel during this litigation. *Compare* ECF No. 34-3 at PageID.1117–35, 1240, 1252 *with* ECF Nos. 31 at PageID.951–54; 79 at PageID.2741–43. At that point, Robert's interpretation and understanding of the Partnership Agreement changed, and he advanced the interpretation he offered in his Motion for Reconsideration. *See* ECF Nos. 31 at PageID.951–54; 79 at PageID.2741–43.

thought Robert needed an Article 5.2 agreement for Robert to be compensated for legal services after the partners executed the Partnership Agreement. *See* ECF Nos. 77 at PageID.2638; 54 at PageID.2019, 2034–35.

If any ambiguity remains about whether Article 5.2 applies to Robert's purported services, the ambiguity is to be construed against Robert, the author of the Partnership Agreement. Indeed, under Michigan law, "ambiguities are to be construed against" the contract's drafter. *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 454 (Mich. 2003). And despite much disagreement in the record, the Parties agree Robert drafted the Partnership Agreement. *Compare, e.g.*, ECF No. 34-3 at PageID.1139 *with* ECF Nos. 77 at PageID.2637; 54 at PageID.2019.

So Article 5.2 applies to Robert's alleged legal-related services, which requires a written agreement with both Parties' consent before Robert can be compensated for them. ECF No. 28 at PageID.915. And another source of harmony in the record is that the Parties did not have an agreement that complied with Article 5.2's requirements. *Compare* ECF Nos. 77 at Page ID.2639–40; 54 at PageID.2042 *with* ECF Nos. 77 at 2693–94, 2703; 34-3 PageID.1117–35. Thus, the Order correctly interpreted Article 5.2 to preclude Robert from capital contribution credit for his alleged legal services provided after the Parties executed the Partnership Agreement.

**2.**

Nor did the Order miscalculate the capital contribution credit for pre-Partnership Agreement legal services. Robert argues that the Order made a "math mistake" when "calculating Robert's work related to . . . drafting the Partnership Agreement." ECF No. 79 at PageID.2746 (cleaned up). To that end, he argues that the Order should have included $15,475 worth of legal services, not just the $6,575 the Order credited him for 26.3 hours of drafting work. *See id.* at PageID.2746–47. But this calculation was no math mistake—it was deliberate. Indeed, Robert

drafting the Partnership Agreement was the only undisputed and corroborated pre-agreement legal

service. And many of the other pre-agreement billing charges were unrelated to Robert's actual

drafting of the Partnership Agreement and unsupported by source documents. *See* ECF No. 31-12

at PageID.1006–07. As a result, this Court will leave its resolution of capital contribution credit

for Robert's alleged legal services unscathed.

**B.**

Turning to Robert's argument about the log cabin on the Pasionek property, the Order did

not err in finding that it was a personal expense. The record indicates Robert owned and placed

the cabin on the property and suggests he did so unilaterally. ECF Nos. 77 at PageID.2645–46;

ECF No. 54 at PageID.2156–60. The cabin is movable—placed "on blocks"—not affixed to the

property. ECF No. 77 at PageID.2647. And even though some testimony provides that James and

others used the cabin, *id.* at PageID.2689–90, other testimony suggests that this use was subject to

limitations from Robert because it was his property, *id.* at PageID.2646; ECF No. 54 at

PageID.2160–63. Considered together, this information supports the Order's finding that the log

cabin was "best characterized as [a] personal expense[]." ECF No. 78 at PageID.2720. Thus,

Robert has not met his burden to demonstrate that the log cabin's classification was a mistake.

**C.**

Finally, Mr. Larson's expert report did not improperly credit James for maintenance costs.

Robert argues that the expert report "mistakenly included as contributions by James several alleged

property maintenance costs" because the Order "held that James's alleged property maintenance

costs are not a capital contribution." ECF No. 79 at PageID.2748–49. Not so. True, the Order

described in general terms "James's property maintenance costs" when stating that James could

not receive capital contribution credit for them. *See* ECF No. 78 at PageID.2720. But in its

executive summary, the expert report attached to the Order accurately clarifies the scope of the prohibited maintenance costs. ECF No. 78-2 at PageID.2733–34. Indeed, the Order's bar on maintenance costs referred to James's vague billings for maintenance like "groundskeeping, mowing, etc." *Id.* The Order did not, however, prohibit James from receiving capital contribution credit for materials costs that were actually incurred for property repairs. *See id.* at PageID.2734. So the expert report did not err in including these materials costs.

In sum, Robert has not demonstrated that the Order made an outcome-changing mistake. The Order correctly concluded that Robert is not entitled to capital contribution credit for his alleged legal services after the Parties executed the Partnership Agreement. It correctly calculated Robert's capital contribution credit for his legal services in drafting the Partnership Agreement. It also did not err in classifying the log cabin as a personal expense. And the expert report did not improperly credit James for maintenance costs. Thus, Robert's Motion for Reconsideration, ECF No. 79, will be denied.

**D.**

Having provided these resolutions, the expert accounting attached to the Order remains intact. ECF Nos. 78-1; 78-2. Thus, Robert's Partnership Account is $42,945, and James's Partnership Account is $80,788. *See* ECF No. 78-1 at PageID.2731. Both Parties have agreed that the Partnership Property is to be auctioned and sold. See ECF No. 78 at PageID.2722–23. Both Parties have further agreed that they are entitled to utilize their capital account to be credited toward their bid if they elect to make one. *Id.* So the Parties will be directed to attend a virtual status conference to discuss the next steps necessary to wind up the Partnership according to the Partnership Agreement and to establish the precise terms of the auction of the Partnership Property.

**IV.**

Accordingly, it is **ORDERED** that Plaintiff's Motion for Reconsideration, ECF No. 79, is **DENIED.**

Further, it is **ORDERED** that the Parties are **DIRECTED** to attend a TEAMS Status Conference on **November 18, 2024, at 1:00 PM EST** to discuss the next steps necessary to wind up the Partnership according to the Agreement and to establish the precise terms of the auction of the Partnership Property.

**This is not a final order and does not close the above-captioned case.**


Dated: November 12, 2024                    s/Thomas L. Ludington
                                            THOMAS L. LUDINGTON
                                            United States District Judge